IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>    Plaintiff, )<br>)<br> -vs- )<br>) <br>FARIDEH HEIDARPOUR, )<br>  a/k/a Faraday Heidarpour, )<br>  a/k/a Faraday Pour; )<br>ALI HEIDARPOUR; and )<br>A.B.C. BILLING, INC., )<br>)<br>    Defendants. ) | No. CR-11-109-M |

**NOTICE OF INTENT TO OFFER**
**CO-CONSPIRATOR HEARSAY**

    The United States of America, by Sanford C. Coats, United States Attorney for the Western District of Oklahoma, through Vicki Zemp Behenna, Assistant United States Attorney submits this notice concerning co-conspirator hearsay statements under Federal Rule of Evidence 801(d)(2)(E).

**FACTUAL BACKGROUND**

**A. The Allegations**

    The indictment charges Farideh Heidarpour, Ali Heidarpour, and A.B.C. Billing, Inc. with conspiracy to violate 18 U.S.C. § 1347. Specifically, the indictment alleges that the Advanced Clinics located in Oklahoma, California and

Texas recruited injured postal employees who were eligible for workers' compensation benefits as patients to the clinics. Once a postal employee had agreed to seek treatment from the Advanced Clinics, they were asked to sign an authorization which allowed employees of the Advanced Clinics to have access to the Department of Labor, Office of Workers Compensation Programs (DOL-OWCP) Claimant Web Portal. Farideh Heidarpour and employees of the Advanced Clinics would access the DOL-OWCP Claimant Web Portal, signing in as the DOL-OWCP claimant, to check the status of the injured employee's claim and to determine if the employee had old unresolved injury claims. If the patient had old claims that had not been resolved, Farideh Heidarpour would encourage the patient to allow the clinic to treat the old injury. Many Advanced patients had multiple claims files with DOL-OWCP, which were opened by the clinics for their patients' multiple injuries.

Farideh Heidarpour would direct Ali Heidarpour and the employees of the Advanced Clinics to perform certain tests and treatment regimens on DOL-OWCP patients. Occupational Therapy Evaluation and Treatment forms were completed by Farideh Heidarpour, or Advanced employees at her direction, outlining the treatment goals, and identifying the treatment and frequency of physical therapy. These forms were used by Farideh Heidarpour and other Advanced employees to obtain authorization from DOL-OWCP for treatment of

2

the injured postal employee. Certain billing codes, such as CPT code 97750 (functional capacity evaluation), CPT code 97110 (therapeutic exercise), and CPT code 97530 (therapeutic activities) required authorization from DOL-OWCP before they could be billed. Billing codes such as CPT code 99090 (analysis of data stored on a computer), CPT code 99080 (special reports), CPT code 99070 (supplies) and CPT code 99354 (prolonged services provided by a physician) did not require authorization from DOL-OWCP before they could be billed.

During the course of the conspiracy, Farideh Heidarpour and A.B.C. Billing, Inc. fraudulently billed DOL-OWCP for CPT code 99090 when other more specific billing codes were billed that included the same service. Additionally, Farideh Heidarpour and A.B.C. Billing, Inc. improperly billed DOL-OWCP for multiple units of CPT code 99090, where the number of units billed generally corresponded to the number of pages contained in an evaluation or report.

Farideh Heidarpour and A.B.C. Billing, Inc. fraudulently billed DOL-OWCP for CPT code 99080 when no special report was prepared by the Advanced Clinics. Farideh Heidarpour and A.B.C. Billing, Inc. billed DOL-OWCP for multiple units of CPT code 99080 which appeared to correspond to the number of pages of the patient's office visit report, therapy evaluation report or study report prepared on the same date of service. Additionally, Farideh Heidarpour

3

and A.B.C. Billing, Inc. billed CPT code 99080 to each separate DOL-OWCP case/claim opened for patients with multiple injuries.

Farideh Heidarpour and A.B.C. Billing, Inc. fraudulently billed DOL-OWCP for CPT code 97750, falsely representing to patients that DOL-OWCP required that a functional capacity evaluation be performed monthly. For patients who received a functional capacity evaluation, Farideh Heidarpour and A.B.C. Billing, Inc. changed or directed employees of the Advanced Clinics to change the date of the evaluation and diagnosis on the duplicated copies of the functional capacity evaluation report, to make it appear that multiple functional capacity evaluations had been performed on different dates and on different body parts. CPT code 97750 was then billed to each DOL-OWCP claim number for each injured body part for the postal employee.

Farideh Heidarpour and A.B.C. Billing, Inc. fraudulently billed DOL-OWCP for CPT code 99070 in conjunction with therapy visits when there was no documentation in the file supporting the billing of supplies. Once again, if the postal employee had multiple DOL-OWCP cases or claims, Farideh Heidarpour and A.B.C. Billing, Inc. billed each case or claim for CPT code 99070.

Farideh Heidarpour and A.B.C. Billing, Inc. fraudulently billed DOL-OWCP for CPT code 99354. This code is used by a physician to report that he spent an additional 30-74 minutes face-to-face with the patient beyond the usual

4

time spent during an office visit. This type of service must be documented in the patient's chart by the treating physician. Farideh Heidarpour and A.B.C. Billing, Inc. fraudulently billed DOL-OWCP for extended office visits knowing that the physician had not spent or documented additional face-to-face time with the patient.

Most of the patients who were seen by Advanced doctors were referred for physical therapy at the Advanced Clinics. CPT code 97110 (therapeutic exercise) and CPT code 97530 (therapeutic activities) are both time-based billing codes billed in increments or units of 15 minutes. When a patient with multiple injury claims with DOL-OWCP received therapy at the Advanced Clinics, they received treatment for all injured body parts during a single visit. However, Farideh Heidarpour and A.B.C. Billing, Inc. fraudulently billed multiple units of these codes to each DOL- OWCP case or claim open for the patient, making it appear that the patient received separate therapy sessions for each injured body part.

### B. The Time Frame

The conspiracy to fraudulently bill DOL-OWCP for the billing codes identified above began in or about January 2005 and ended in or about December 2009.

### C. Membership in the Conspiracy

For the purpose of the admission of co-conspirator hearsay, the government contends that at all relevant times, Farideh Heidarpour, Ali Heidarpour, A.B.C. Billing, Inc., the Advanced Clinics located in Oklahoma, California and Texas, and certain employees acting on behalf of the Advanced Clinics were members of the conspiracy.

**CO-CONSPIRATOR STATEMENTS TO BE OFFERED AT TRIAL**

The government anticipates that it will offer the following testimony, as well as documents which contain co-conspirator hearsay. The statements will be substantially similar to the statements identified below. Documents will be identified in this notice by category. The defendants will be provided copies of the documents currently identified as containing co-conspirator hearsay since they are too numerous to identify in this notice. In addition to the items identified below, the government reserves the right to add statements and documents to the list of co-conspirator statements. The government is in the process of identifying its witnesses and exhibits. As that process becomes more refined it may be necessary to add additional statements and documents. All such statements and documents will be identified in advance of the *James* hearing.

## A. Testimony

**<u>Marie Coffey</u>:**

- On an occasion when Coffey stopped an FCE to prevent a patient from suffering serious physical illness, Farideh later called her and told her she should not have stopped the FCE before it was completed.

- Farideh told Coffey to give each patient 2 units of exercise and 2 units of functional activity at each visit. Coffey told her some patients were not strong enough to do that, and she did not force patients to do 2 units when not able. Coffey marked the treatment sheet according to how many units the patient performed but never saw the sheet after it was faxed to Farideh.

**<u>Cameron Graham</u>:**

- There have been instances when no exercise/activity was provided and he was told by Farideh or another staff member directed by Farideh to mark that some exercise was done.

- If a patient refused to perform an activity or exercise, Graham would not fill in any information on the exercise flow sheet, but per Farideh's instructions would circle one unit to indicate activity or exercise even though there was not any.

- Graham treated patient E.G. only for his knee on one occasion as the patient did not want treatment on his back that day. Farideh told Graham to

pull E.G.'s chart and list the same dates of service for treatment of his back as listed for his knee, and told Graham that she had called E.G. and verified he had treatment for his back that day as well as his knee. Graham talked to E.G. a week later and he told Graham that Farideh never contacted him.

- New employee, Monica Gilmer, told Graham that Farideh contacted her and told her they would not be paid for treatment of patient R.O. unless treatment for both of his injuries was documented in the charts and the dates had to match. Graham had treated R.O. for a shoulder injury in the last few weeks, and he also had a knee injury, but R.O. had not wanted the e-stim treatment on his knee during the last few visits. Gilmer told Graham she had to make up progress notes for the treatment of R.O.'s knee and then faxed them to Farideh. Farideh tells employees that in order to be paid, treatment dates have to match for both injuries/claims.

- Kristi Janelli told Graham that Danielle Sachetti, who performs FCEs, takes a previous FCE and does not run new data but just changes the date.

- He received $5 to $10 bonuses based on the number of tests he performed. Farideh told him about the bonuses he would receive.

- Staff meetings were held by Dr. Lavigna, Farideh and Ali every couple of months, and sometimes Dr. Hebrard would attend. During the meetings, Farideh initially told the staff to circle 2 units for each therapeutic

8

exercise and activity for each injury claim/body part, but she later changed that to 3 units.  Thereafter, Graham and the other employees circled the 3 units even though that number was not performed.

- Farideh would call him and other employees and tell them they needed to bill more units for therapy.  Graham followed her orders and created a false progress note for the day patient E.G. was not seen at AOR.  Farideh ordered him to make changes, alter or create progress notes and other records every couple of months.

**Gena Daniels:**

- Dr. Lavigna instructed the techs and COTAs what they needed to bill for therapy at staff meetings.  These staff meetings were run by Dr. Lavigna, Dr. Hebrard and Farideh.  Dr. Lavigna and Farideh would instruct what number of units to bill; Dr. Lavigna instructed everyone at the meetings to provide orthotics for all patients regardless of type of injury; Dr. Lavigna and Farideh told staff to bill a certain amount of time for each ultrasound and a certain number of units for e-stims, and to order EMGs for every patient.  Dr. Hebrard was present at meetings when these orders were conveyed to the staff.

- Daniels received bonuses based on the number of patients scheduled and for the number of FCEs scheduled.

**Donisha Hamilton:**

- Farideh played "mind games" and would call and ask staff why they had not billed for a patient's therapy. Farideh would tell them she talked to the patient and the patient said they had the therapy, and Farideh would then prepare progress notes and send them to the clinic and have employees add them to the patient's chart.

**Linda Hembree:**

- She attended a U.S. Postal Service union hall meeting in May 2008 conducted by Farideh and Dr. Hebrard in which Farideh told attendees she could get them schedule awards and had specific impairment rating books which facilitated getting them processed and approved. Dr. Hebrard explained how he conducted impairment rating exams.

- The staff and Farideh told Hembree that FCEs were a requirement for a schedule award, and she had 3 FCEs: June 2008, August 2008, and January 2010.

**Kristi Janelli:**

- She received bonuses for every test and massage she performed. She was told by Farideh to circle the dates on her time sheets that she did massages because Farideh didn't want the other employees to know she was getting bonuses for massages.

**Dr. Bonnie Lammers:**

- Veronica LNU is the receptionist and tells Lammers what tests Farideh wants done on a particular patient.

- Farideh, Veronica and Ali wanted her to order FCEs, which she did initially.

- When Lammers found a stack of blank occupational therapy orders with her signature on them, Ali contacted Farideh on the speaker phone with Lammers present and Farideh admitted they had xeroxed her signature and made copies.

- From her first day, Farideh was always telling her which tests to order.

- Lammers noticed that all patients were getting the same schedule of tests, and there was a sheet with either a CA-1 or CA-2 claim number on which Farideh had listed the tests she wanted done for each patient, such as EMG, vascular studies or orthotics. When Farideh was not in the office, Veronica LNU would tell Lammers that Farideh wanted certain tests conducted.

- Dr. Lavigna and Dr. Hebrard called Lammers one day, and she told them she needed to see the patients before any tests were ordered. Dr. Hebrard said he would allow that, and said "We will let you see the patient first, although that's not the way it's done in California, and then (you can) put your stamp of

11

approval on the treatment plan." This call was shortly after she had treated patient T.L.J.

- Lammers found that her name had been signed on different patient documents but it was not her signature. She kept asking Ali about it, and he ultimately called Farideh and she told Ali the doctor (Lammers) had told her to do it. Farideh admitted to Lammers she had xeroxed multiple copies of Lammers' signature to save time. Lammers' found her signature on a patient chart dated March 7, 2008, which was before Lammers started employment at the Advanced Clinic in Texas.

**Karen Lew:**

- When she asked Dr. Lavigna why they scheduled multiple FCEs for multiple body parts instead of one FCE for the entire body, he said it helped to support the patient's ongoing limitations.

- Farideh told Lew it was not a mistake when she scheduled a patient for 2 FCEs a week apart because the OWCP would not accept one test for the entire body, and that you could not do one FCE and apply it to the different OWCP cases or different body parts.

**Sharon Picha:**

- Farideh contacted Picha several times when she worked in Rohnert Park to ask why she did not bill for 3 or 4 units. When Picha told her that many

units were not needed, Farideh would let her know that as not acceptable and she needed to bill for 3 or 4 units.

### Danielle Sachetti:

- Farideh told Sachetti she was to receive bonuses for each FCE she faxed to Farideh and for strapping feet.

- Farideh told Sachetti when she first started working at the clinic that she wanted 2-3 units billed (circled) for both exercises and activities. When Sachetti circled 1 unit, Farideh called her up and told her to circle 2-3, and told her not to worry about it because Sachetti was not in charge of billing. Farideh told her not to worry about how long the patient actually performed the activities/exercise, but always to circle at least 2-3 units.

- For patients with multiple body parts, Farideh told her to perform one FCE and produce additional FCE reports for each injured body part. Farideh told her to pull the patient history which was stored in the Matheson System from the previous FCE. At Farideh's direction, Sachetti would change the date on copies of one FCE report to reflect a new date for each of the other body parts.

- Farideh told her she needed to be sure the patient came in for therapy the day after the FCE was conducted in order to submit the second FCE report.

13

**Amy Shrodes:**

- Farideh told Shrodes that you should always bill certain codes, like 97110 and 97530, because they make good money.

- Farideh told her if the patient name on the Occupational Therapy Progress Notes was not on the sign-in sheet to add their name to the sign-in sheet. Shrodes added the names of R.J. and K.E. and returned her copy with the added names to Farideh per Farideh's orders.

**Rebecca Storey:**

- Farideh ordered the staff to circle 2 to 3 units on their progress notes.

- Storey caught Amanda LNU going through one of her patient charts and Amanda told her that Storey had not included all the therapy that was completed on the progress notes, and that Farideh wanted them changed. Storey then talked to Farideh and told her the patient refused treatment that day. Farideh was adamant that patients get the "full treatment" at every visit.

- Farideh contacted her several times asking why Storey did not complete the progress notes for different treatments. Storey told her the treatment was never conducted; however, Farideh told her she talked to the patients and they advised they did have the treatment. When Storey asked the patients, they said they never talked to Farideh.

- Farideh changed the frequency of FCEs to every 30 days, and told Storey that OWCP wanted it for their cases.

- Farideh wanted her to prepare an FCE report and make copies for each affected body part.

**Michael Tesson:**

- Farideh told him FCEs were required every 30 days. He saw a notice displayed at AOR that stated: "FCEs are required every 30 days to continue your treatment."

- Farideh would call him and tell him he needed to come to therapy 3 days a week.

**Emily Wyrick:**

- Farideh told Wyrick that Farideh billed 4 hours for each patient's therapy. When Wyrick told Farideh that patients are only in therapy for 1 to 1-1/2 hours, Farideh told her she was confused and did not know about these things.

- Farideh called her and told her if she was not going to back up Farideh with what was in the patients' charts, she needed to give her 2-week notice.

- Farideh told her FCEs were required every 30 days to keep the OWCP cases open.

15

- Farideh ordered that if a patient was being seen for multiple injuries, therapy sessions were combined into one but there were individual charts for each injured body part.

- Farideh told her to set up separate patient charts for each injured body part.

- She and other members of the staff would put blank prescription forms in the patient file when they were going in to see Dr. Barney and he would sign it and fill in the patient's name. Dr. Barney never marked out any of the treatment that was pre-circled on the forms -- all patients got all the treatments.

- She knows there were a lot of conversations between Danielle Sachetti and Farideh about the number of units of therapy to circle.

- After the search, Wyrick started asking Farideh questions about what was going on. Farideh called Wyrick and started telling her about her billing, i.e., that she bills 4 hours for therapy a day for patients, and Wyrick told her that wasn't what the patients were doing and that she filled out sheets showing the times the patients got there and left and put them in the files. Farideh told her she was crazy and didn't know what she was doing.

- Farideh told Wyrick patients were to get FCEs every 30 days to keep the case active.

- Wyrick believes that, for patients with multiple body parts, FCEs were billed on separate days as separate tests. If there was a problem with the dates on the FCEs, she would get a phone call and Farideh would talk to Danielle and Danielle would reprint the FCE with a different date. If Danielle saw a patient during the week for an FCE, she would print off 4 different dates of FCEs and they would fax them to Farideh.

**Muriel Mayes:**

- Dr. Lavigna and Farideh asked her to do separate FCE reports for each claim. However, in the past year or so they stopped asking and she is no longer doing them that way.

- The two doctors and Farideh asked her to sign off on documentation relating to patients Mayes did not see, which she refused.

- Mayes has heard Farideh tell people in the office to bill a minimum number of units of therapy.

### B. Documents

The category of documents identified by the government as containing co-conspirator hearsay include: the consulting agreement by and between Advanced Medicine and Rehabilitation of Texas, P.A. and A.B.C. Billing, Inc.; Advanced Occupational & Rehabilitation Inc. Physical Therapy and/or Occupational Therapy Evaluation and Treatment forms; treatment protocols;

17

Physical Therapy/Occupational Therapy Authorization Request Templates; OWCP seminar flyers; employee bonus agreements; employee time sheets reflecting test performed, appointments scheduled, and bonuses earned, including time sheets reflecting hours worked by Dr. Barney and the length of time he spends with patients; OT and/or front office Sign-in sheets; handwritten notes regarding billing, authorizations, denials, reprocessing, scheduled FCEs, progress notes with handwritten notes from Farideh regarding billing codes, and handwritten notes regarding opening new claims for clients; Archived Communication Record Detail Reports; explanation regarding procedure code 99215; and email from Robert Bacci to Farideh with Dr. Lavigna's handwritten note.

## CONCLUSION

Each of the statements and documents identified above were made by conspirators, both indicted and unindicted, during and in furtherance of a criminal conspiracy, and therefore should be admitted under Rule 801(d)(2)(E). The government respectfully requests the Court to make a preliminary ruling that the statements identified above – and similar statements that the government may discover before or during trial – will be admitted under the co-conspirator hearsay rule.

Respectfully submitted,

SANFORD C. COATS
United States Attorney


*s/Vicki Zemp Behenna*
VICKI ZEMP BEHENNA
Okla. Bar Number 10734
Assistant U.S. Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8700 (office)
(405) 553-8888 (fax)
vicki.behenna@usdoj.gov


**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2012, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants: Drew Neville, Kevin E. Krahl and John Gile.


*s/Vicki Zemp Behenna*
Assistant U.S. Attorney