# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| -vs- | ) No. CR-11-109-M |
| FARIDEH HEIDARPOUR, | ) |
| a/k/a Faraday Heidarpour, | ) |
| a/k/a Faraday Pour, | ) |
| | ) |
| Defendant. | ) |

## **GOVERNMENT'S CORRECTED SENTENCING MEMORANDUM**

SANFORD C. COATS
United States Attorney

VICKI ZEMP BEHENNA
Assistant U.S. Attorney
Bar No. 10734
210 Park Avenue
Suite 400
Oklahoma City, Oklahoma  73102
(405) 553-8753
(405) 553-8888

Attorneys for Plaintiff

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

    A.    DEFENDANT'S OWNERSHIP IN AND CONTROL OF THE
        ADVANCED CLINICS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

    B.    DOL-OWCP and ACS SYSTEM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

    C.    FARIDEH HEIDARPOUR MANIPULATED THE DOL-OWCP and
        ACS SYSTEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

    D.    FRAUDULENT MEDICAL BILLING SCHEMES. . . . . . . . . . . . . . . . . -9-
        1.    Functional Capacity Evaluations (FCEs). . . . . . . . . . . . . . . . . . -9-
        2.    Analysis of Date Stored in Computers. . . . . . . . . . . . . . . . . . . -11-
        3.    Special Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
        4.    Supplies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
        5.    Prolonged Office Visits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
        6.    Therapeutic Exercises and Activities. . . . . . . . . . . . . . . . . . . . -15-

    E.    HEIDARPOUR'S DEPOSITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

    A.    ENTRAPMENT BY ESTOPPEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

    B.    RELEVANT CONDUCT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

    C.    ACCEPTANCE OF RESPONSIBILITY. . . . . . . . . . . . . . . . . . . . . . . -25-

    D.    ABUSE OF POSITION OF TRUST. . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

    E.    FINE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

# TABLE OF AUTHORITIES

**Page**

## CASES

*United States v. Apperson,* 441 F.3d 1162 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . -20-

*United States v. Bindley,* 157 F.3d 1235 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . -27-

*United States v. Brown,* 7 F.3d 1155 (5th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

*United States v. Brunson,* 54 F.3d 673 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . -32-

*United States v. Buck,* 324 F.3d 786 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

*United States v. Conner,* 262 Fed.Appx. 515, 2008 WL 215399 (C.A. 4 (N.C.)). . . -33-, -34-

*United States v. Contreras,* 59 F.3d 1038 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . -26-

*United States v. Edwards,* 325 F.3d 1184 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . -32-

*United States v. Garrison,* 133 F.3d 831 (11th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . -30-

*United States v. Griffith,* 584 F.3d 1004 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . -24-

*United States v. Hamilton,* 587 F.3d 1199 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . -23-

*United States v. Hill,* 915 F.2d 502 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

*United States v. Hirsch,* 239 F.3d 221 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

*United States v. Hodge,* 259 F.3d 549 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

*United States v. Isley,* 369 Fed.Appx. 80, 2010 WL 801736 (C.A. 11 (Ga.)). . . . . . . . . . -21-

*United States v. Lovern,* 590 F.3d 1095 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . -20-, -21-

*United States v. McAlpine,* 32 F.3d 484 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . -27-

*United States v. Miller,* 607 F.3d 144 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

*United States v. Mitchell,* 113 F.3d 1528 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . -27-

*United States v. Nichols,* 21 F.3d 1016 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

*United States v. Patron-Montano,* 223 F.3d 1184 (10th Cir. 2000). . . . . . . . . . . . . . . . . . -28-

*United States v. Quarrell,* 310 F.3d 664 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

*United States v. Read,* 2012 WL 5377737 (C.A. 5 (Tex.)). . . . . . . . . . . . . . . . . . . . . . . . . . -34-

*United States v. Spear,* 491 F.3d 1150 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

*United States v. Suitor,* 253 F.3d 1206 (10th Cir.2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

*United States v. Topete-Plascencia,* 351 F.3d 454 (10th Cir. 2003). . . . . . . . . . . . . . . . . . -27-

*United States v. Valladares,* 544 F.3d 1257 (11th Cir. 2008). . . . . . . . . . . . . . . . . .   -22-, -23-

*United States v. Wach,* 907 F.2d 1038 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

*United States v. Watts,* 519 U.S. 148 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

*United States v. Westover,* 107 Fed.Appx. 840, 844, 2004 WL 1790016
  (C.A. 10 (Kan.)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

*Wade Pediatrics v. Dept. of Health & Human Services,* 567 F.3d 1202
  (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

*Witte v. United States,* 515 U.S. 389. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

## **STATUTES**

Title 18, United States Code, Section 1347. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

Title 18, United States Code, Section 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

Title 18, United States Code, Section 3571(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

Title 18, United States Code, Section 3571(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

Title 18, United States Code, Section 3572(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

Title 18, United States Code, Section 3572(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

## **SENTENCING GUIDELINES**

U.S.S.G. § 1B1.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-, -24-

U.S.S.G. § 1B1.3 Application Note 9(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

U.S.S.G. § 1B1.3 Application Note 9(B).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

U.S.S.G. § 3B1.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-, -32-

U.S.S.G. § 3E1.1 Application Note 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

U.S.S.G. § 3E1.1.  Application Note 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-, -28-, -29-

U.S.S.G. § 6A1.3(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

## **RULES**

## **OTHER AUTHORITIES**

Section 10.801 of Title 20, CFR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CR-11-109-M |
| | ) | |
| FARIDEH HEIDARPOUR, | ) | |
| a/k/a Faraday Heidarpour, | ) | |
| a/k/a Faraday Pour; | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S CORRECTED SENTENCING MEMORANDUM

The government submits the following Sentencing Memorandum in response to the numerous factual objections filed by the defendant, Farideh Heidarpour. Ms. Heidarpour has objected to every paragraph describing relevant conduct. As a result, the United States must set out the relevant facts in some detail. After a discussion of the facts, this Memorandum will address the applicable Sentencing Guidelines and general sentencing considerations under 18 U.S.C. § 3553(a).

## FACTS

### A. DEFENDANT'S OWNERSHIP IN AND CONTROL OF THE ADVANCED CLINICS

Farideh Heidarpour owned one-third of the Advanced clinics in Oklahoma City and Tulsa together with Dr. Michael Hebrard and Dr. Richard Lavigna. Although not formally an

owner in California and Texas, corporate profit and loss statements showed that Heidarpour received "draws" comparable to those of the two doctors for those clinics as well. Heidarpour was also the medical biller for all Advanced clinics, and as such, received a percentage of all claims paid (approximately 12-15%) on top of her ownership draws.

The Advanced clinics targeted a patient population of injured postal workers who were eligible for medical benefits from the U.S. Department of Labor, Office of Worker's Compensation Programs (DOL-OWCP) as a result of job-related injuries. Postal workers were recruited by Heidarpour and the two doctors through seminars at postal union halls. Once the injured postal employees walked through the doors of the Advanced clinics, they received a battery of tests, doctor visits, physical and occupational therapy, and other treatment which was directed by Heidarpour, who controlled the Advanced clinics operations on a day-to-day basis.

Heidarpour handled every aspect of the operation whether she was in the office or not. She called the clinic multiple times a day and she directed clinic employees to fax patient sign-in sheets, therapy progress notes, and charge sheets to her for billing at the end of each day. Heidarpour would fax documents to the clinics from her home in Edmond each day including new patient schedules and lists of tests and treatment services the patients scheduled for that day were to receive.

Heidarpour directed all Advanced employees to create separate patient charts for each injury, and obtain a different DOL-OWCP claim number for each injury. Dr. Lammers, a physician hired to work in the Dallas office of the Advanced clinics, said that Heidarpour told her, as well as others, that they had to maintain separate patient charts for each injury claim

accepted by DOL-OWCP, and that a copy of each doctor or therapy progress note needed to be placed in each patient's chart.

Heidarpour would direct Advanced employees to perform standard diagnostic tests and treatment services on all DOL-OWCP patients, regardless of their injury. These standard tests were to be administered at Heidarpour's direction based on whether the injury was located in the upper body or lower body. If tests were not given to the patients, she would call the employees directly to find out why.

Heidarpour instituted a bonus plan for employees and doctors for scheduling patient appointments, recruiting new patients, meeting a patient office visit quota, performing FCEs (functional capacity evaluations), printing and faxing duplicate FCE reports to her, and performing other standard tests on a routine basis such as vascular studies (VAS), thoracic outlet syndrome (TOS), and EMGs. This bonus program was not to reward employees for their hard work, but to incentivize employees to perform certain diagnostic tests and treatment services whether the patient needed the treatment or not.

Pre-circled "Occupational Therapy Evaluation and Treatment" forms were kept at the front desk and/or placed in patient files outlining the treatment a patient was to receive. These forms were used by Heidarpour and other Advanced employees to obtain authorization from Affiliated Computer Services (ACS) for physical therapy and FCEs. Some reflected a signature stamp of a doctor, some had a place for a doctor to circle his or her name, and some were to be originally signed by a doctor. An order for therapy signed by a doctor had to accompany requests for authorization for services from DOL-OWCP. Dr. Lammers said that standard tests

and treatment services were ordered by Heidarpour.  For example, an occupational therapy evaluation and treatment form for D.G. directed what tests and treatment services Lammers was to order for the patient.  These types of forms were stacked at the front desk with the tests and treatment services pre-circled, with Dr. Lammer's signature xeroxed on the form and the patient name blank.  An Occupational Therapy form for patient R.C. dated March 17, 2008 bears Lammers' xeroxed signature; however, Dr. Lammers did not begin work at Advanced until April 8, 2008.  Dr. Lammers never gave Heidarpour or anyone else at the clinic permission to place her signature on these forms.

Heidarpour would become angry when a doctor failed to order a test she wanted to be done because she could not bill for it.  Emily Wyrick, an employee in the Tulsa office of the Advanced clinic, was given the pre-circled forms by Heidarpour on Wyrick's first day of work and told that every patient was to receive these tests monthly as well as an FCE.  Patients who received physical or occupational therapy were also to be treated routinely with certain modalities, such as electrical stimulation (e-stim), infrared, and ultrasound.

Another Tulsa employee, Rebecca Storey, said that if patients refused treatment, Storey would not complete progress notes for them for that particular day.  At times, Heidarpour directed Storey to complete the progress note, claiming Heidarpour had spoken with the patients and confirmed they had received the treatments.

Heidarpour would ask new postal patients to give Advanced authorization to access the DOL-OWCP Claimant web portal (intended for access by the patient/claimant only).  Access to this portal allowed Heidarpour to see a patient's prior work-related injuries and the

disposition of those claims. Heidarpour encouraged patients to allow Advanced to re-open unresolved claims, promising that this was a means for them to receive "schedule awards" for each injured body part. Re-opening unresolved claims provided another opportunity for Heidarpour to bill DOL-OWCP for that injured federal employee.

Many postal patients of the Advanced clinics remained in physical or occupational therapy treatment for years. Heidarpour would tell the patients DOL-OWCP required them to continue therapy to get their schedule awards. If they refused to continue treatment, Heidarpour would threaten to close the patient's files so that they could not pursue their DOL-OWCP schedule award.

A patient named M.T., who had a cast on his leg when he first saw Dr. Barney, a physician at the Tulsa office of the Advanced clinics, was told by Heidarpour to immediately start therapy. He waited until his cast was off, before beginning therapy. He was in therapy about a year before he quit going because he was tired of doing it. During that time, Heidarpour would call the patient and insist he come to the clinic three times a week for therapy. When he quit coming, Heidarpour called him and told him if he quit, he wouldn't get the schedule award.

Dallas patient G.J. was told that he had to continue his current course of treatment for one year and then participate in the pain management program before Advanced would consider scheduling him for an impairment rating evaluation. G.J. ultimately sought permission from DOL-OWCP to change his physician and left the Advanced clinic.

Yet another patient L.H. went to Advanced and was told by Heidarpour that she had to attend physical therapy 3 times a week. The patient refused to go to physical therapy as her

injuries were 15 years old.

Finally, employees who provided physical or occupational therapy for injured postal employees were told by Heidarpour: 1) to treat 20 patients per day; 2) produce separate progress notes and charge sheets for each injured body part accepted by DOL-OWCP, so that each of the patient's injury claims could be charged as if there had been multiple therapy sessions for each injury, with no pro-rating of charges among the number of cases; and 3) to always circle 2 to 3 units of therapy for each therapy session regardless of the amount of therapy provided.

## B.     **DOL-OWCP and ACS SYSTEM**

The Federal Employees' Compensation Act (FECA) provides federal employees injured in the performance of their duties with workers' compensation benefits. The FECA is administered by the U.S. Department of Labor, Office of Workers' Compensation Programs (DOL-OWCP). During the time frame of the defendant's schemes, Affiliated Computer Services (ACS) administered the authorization process and payment of claims for DOL-OWCP. ACS had the authority to provide authorization for certain types of medical care. For example, ACS could approve treatment for a broken arm, as well as physical therapy for treatment of a broken arm for the first 120 days. Beyond the first 120 days, providers were required to submit medical documentation explaining the need for additional therapy, under the signature of the treating physician. A DOL-OWCP claims examiner had to approve extended treatment for injured federal employees.

Only certain CPT codes billed by Farideh Heidarpour to DOL-OWCP required prior authorization. These included physical therapy codes 97110 and 97530, and functional capacity

examination code 97750. CPT codes 99070 (supplies), 99080 (special reports), 99090 (analysis of data stored on computer, and 99354 (prolonged services provided by a physician) did not require prior authorization from ACS or a DOL-OWCP claims examiner. Heidarpour was well aware that authorization for a service did not guarantee payment.

When a request for treatment came to ACS, ACS was only required to confirm 1) that the request for medical authorization was appropriate for the OWCP accepted condition, i.e. injury, and 2) determine the level of the request for medical authorization. If the request was a level 4, it was referred electronically to a DOL-OWCP claims examiner for approval. ACS employees who provided initial medical authorizations were not licensed health care professionals.

When a medical provider requested payment for services provided to an injured federal employee, a HCFA 1500 or OWCP 1500, a claim form, was completed and sent either through the mail or electronically to the DOL-OWCP processing center in Kentucky. It should be noted that DOL-OWCP did not require a medical provider to attach medical records to the HCFA 1500. However, DOL-OWCP did require a medical provider to maintain records of the services provided in the event DOL-OWCP requested copies of an injured federal employee's medical records. The HCFA 1500 and any documentation attached to the HCFA 1500 were scanned and sent to ACS for processing and payment. The medical documentation, if any, was sent to the Department of Labor's IFECS system and placed in the claimant's medical case file. ACS had absolutely no access to the injured federal employee's medical file maintained in the IFECS system. Likewise, DOL-OWCP claims examiners had no knowledge what was being paid by

ACS.  Unfortunately, this created a total bind spot exploited by Heidarpour.

Representations to this Court and to the U.S. Probation Office by Heidarpour that the DOL-OWCP system had a "stringent claims review process" that approved the defendant's billing methodology is completely false.  The citation to the DOL-OWCP Claims Manual for the proposition that claims examiners are to exercise "keen judgment in the review of and adjudication of claims and *requests for payment*" is a complete misrepresentation of fact to this Court.  Defense Exhibit DX0011-0077 entitled "Responsibilities of the Claims Examiner" addresses OWCP claims examiner's responsibilities for adjudicating the injured federal employee's claim, and authorizing benefits and "compensation payments" to the injured federal employee.  DOL-OWCP had nothing to do with the payment of medical claims to providers, as Farideh Heidarpour well knew.  That was solely the responsibility of ACS.

## C.     FARIDEH HEIDARPOUR MANIPULATED THE DOL-OWCP and ACS SYSTEM

Amy Harris, a supervisor at the ACS call center, first became familiar with Heidarpour and the Advanced clinics in May 2009.  Authorizations by ACS to provide medical services for certain CPT codes could be obtained through faxing or electronically submitting requests for authorization.  Harris learned that Heidarpour and other Advanced employees would contact the ACS call center, and hang up and call back until they reached a representative who gave them the result they wanted, i.e. authorization for treatment.

Upendo Sabree, a senior claims examiner at DOL-OWCP, also became aware of Heidarpour and the Advanced clinics around May 2009 as a result of complaints logged by Heidarpour about payment denials from ACS.  During Sabree's investigation of the complaints,

she found that Heidarpour and others at her direction were circumventing the standard system of review of authorizations for therapy by DOL-OWCP claims examiners by obtaining extensions of dates of service from ACS well beyond the initial 120 days, for massive volumes of physical therapy authorizations. She also found multiple claims being submitted by Heidarpour under multiple claim numbers for the same patient which resulted in large volumes of therapy being paid for a single patient. She also found that FCEs (CPT 97750) were being billed on multiple days for multiple claim numbers for the same patients, and that numerous extensions of dates of service for FCEs were being obtained.

### D. FRAUDULENT MEDICAL BILLING SCHEMES

Heidarpour was charged with using 7 CPT codes to bill DOL-OWCP for services that were not provided. For each of these codes, there was no medical documentation to support the charge and no evidence the service was provided to the injured federal employee.

#### 1. Functional Capacity Evaluations (FCEs)

Heidarpour billed DOL-OWCP $104,485.81 for FCEs (CPT code 97750) the Advanced clinics never performed. CPT code 97750 includes reimbursement for the time required to perform the testing for an FCE, to analyze the findings, and to write a report. Heidarpour pled guilty to fraudulently billing DOL-OWCP for these evaluations.

It should be noted that the restitution amount for this count of conviction represents actual loss. In four years, the Advanced clinics submitted hundreds of bills to DOL-OWCP for FCEs and collected over $740,000 in payments. The government's expert, Teresa Cliett, was physically unable to review every patient file and bill to determine if duplicate FCEs existed in

every single submission. However, Ms. Cliett did conduct a medical review of a sample of cases which involved reviewing each medical file and each bill Heidarpour submitted to DOL-OWCP for FCEs. In each of these cases, Ms. Cliett would testify that one FCE was performed but that duplicate reports were created from that one test by changing the dates of service, diagnoses and injuries. Those duplicate reports were filed in each separate patient chart and were billed by Heidarpour to OWCP as if separate FCEs had been performed for separate injuries/claims.

During her plea, Heidarpour confirmed that the Advanced clinics did FCEs on injured postal employees. She admitted that one FCE was done and that copies of the FCE were made for other claim files. Heidarpour admitted she billed DOL-OWCP for multiple FCEs to the other claim files open with DOL-OWCP for the Advanced patient, resulting in duplicate billing to DOL-OWCP.

An FCE measures the function of the entire body and takes several hours to complete. Heidarpour directed Ms. Storey to prepare the FCE report, duplicate a copy for each injury claim, and send the completed FCEs to Heidarpour by fax. At her direction, Storey printed off multiple FCE reports from the computer, changed the dates and diagnose from the original report and faxed the FCE reports to Heidarpour. Ms. Storey received bonuses from Heidarpour for the number of FCE reports she generated. Muriel Mayes, a physical therapist in the California office of the Advanced clinic, also said Heidarpour told her to create separate FCE reports for each injury claim. Heidarpour asked her to prepare separate reports, and to change the dates of service to make it appear that multiple FCEs had been conducted. Documents

obtained during the investigation corroborate these witnesses. Government Exhibit 413, which will be introduced at the sentencing hearing together with other relevant exhibits, is a document originally prepared by Ms. Storey. The document contains Heidarpour's cursive handwriting which directs an employee in Oklahoma City, "Carolyn," to "change the dates for each diagnoses" and to "date re-port" after you are finished testing on a FCE.

### 2. Analysis of Date Stored in Computers

Heidarpour billed DOL-OWCP $88,800.00 for analysis of data stored in computers (CPT code 99090). The loss amount represents actual loss from files reviewed by Ms. Cliett. CPT code 99090 is billed for analysis of data stored in computers when that service is not covered under another CPT code. No pre-authorization was required by OWCP to bill for this code. This code was billed by Heidarpour in conjunction with FCEs, nerve studies and vascular studies all of which were billed under specific CPT codes that already included that service in the reimbursement amount. Heidarpour also improperly billed multiple "units" of 99090 where the number of "units" billed would generally match the number of pages in a patient's written evaluation or study report found in the patient's file for that date of service.

Ms. Cliett did a medical review of the patient's medical records and the bills submitted to DOL-OWCP. For example, Ms. Cliett reviewed the billing of 4 "units" of 99090 by Heidarpour on September 20, 2006 for California patient, R. J. on the same date as the billing of a nerve study (CPT 95903 and 95904), which codes already included reimbursement to the provider for the analysis of the data stored on the computer for that test. Ms. Cliett reviewed the entire Advanced patient chart for R.J. and found no documentation to support the charges for

99090.

As a result of Heidarpour billing CPT code 99090 and other tests that included the analysis of data stored in computer, Advanced received double payment from DOL-OWCP for that service - once from the reimbursement for the nerve study or other such tests, and again from the billing of 99090 for a service already covered. Heidarpour stopped billing this particular code in June 2007 because DOL-OWCP stopped reimbursing all providers for this service at that time.

### 3. Special Reports

Heidarpour billed DOL-OWCP $613,356.77 for special reports (CPT code 99080) that the Advanced clinics never prepared. The loss amount represents actual loss from files reviewed by Ms. Cliett. CPT code 99080 is for special reports, such as insurance forms, when more information is required than in a usual medical communication or standard reporting document. No pre-authorization from ACS or OWCP is required for the provider to bill for this code. Ms. Cliett's medical review showed that Heidarpour billed 99080 by billing a number of "units" that matched the number of pages of a patient's office visit report, therapy evaluation report, or study prepared on that date of service. In addition, Heidarpour billed this code to each OWCP claim number for those patients who had multiple injuries claims with DOL-OWCP. Heidarpour billed this code when no "special report" was requested by OWCP or prepared by the clinics.

During the medical review, Ms. Cliett found that there was no documentation contained in the Advanced patient charts to support the billings of CPT 99080. In the case of L.W., Ms.

Cliett found that on May 8, 2006, Heidarpour billed 4 "units" of 99080 and a nerve study, the latter of which already included reimbursement for a written report. The number of "units" billed by Heidarpour simply matched the number of pages of the nerve study.

As to patient J.S., the medical review revealed that no special report existed in the medical file, and that Heidarpour duplicate-billed 2 "units" of 99080 on March 21, 2007 along with an office visit to two separate claim numbers of J.S. Here, the number of "units" billed on those two separate cases matched the number of pages of the report prepared for the office visit. Again, the medical review showed no documentation to support the billing of CPT code 99080 to DOL-OWCP for that date of service.

Finally, as to G.J., Ms. Cliett found that Heidarpour submitted three duplicate bills for 9 "units" of 99080 on December 19, 2007, December 20, 2007 and December 26, 2007 to each of G.J.'s claim numbers, representing reports for one FCE billed on December 20, 2007, which code already provided reimbursement for the FCE report. Ms. Cliett found that one FCE was performed on G.J. on December 19, 2007, yet additional FCE reports were duplicated from that FCE for dates of service of December 20, 2007 and December 26, 2007 for the other claim numbers opened for G.J.'s other injuries. Not only did the government pay multiple times for a single FCE performed on December 19, 2007, but also for the same FCE which was fraudulently submitted and billed as multiple special reports in each of G.J.'s claim files.

### 4. Supplies

Heidarpour billed DOL-OWCP $72,610.04 for supplies (CPT code 99070) the Advanced clinics never provided. The loss amount represents actual loss based upon files reviewed by Ms.

Cliett. CPT code 99070 is for supplies provided to patients over and above those usually included in the CPT code for an office visit or physical therapy. No pre-authorization from ACS or DOL-OWCP is required for the provider to bill for this code. Heidarpour billed CPT 99070 in conjunction with therapy visits where there was no documentation in the patient file to show that any additional supplies had been used or provided to the patient. As in the other billing schemes, when a patient had multiple DOL-OWCP claims open for multiple injuries, Heidarpour would duplicate the supplies and bill each claim separately.

Additionally, Ms. Cliett discovered that Heidarpour attached the identical invoice for supplies to support numerous instances of billing of 99070 for R.J. on dates of service spanning several years.

### 5. Prolonged Office Visits

Heidarpour billed DOL-OWCP $64,275.47 for prolonged office visits (CPT code 99354) the Advanced clinics never provided. The loss amount represents actual loss from files reviewed by Ms. Cliett. CPT code 99354 is used to bill for prolonged services provided by a physician during a face-to-face office visit with the patient. No pre-authorization from ACS or DOL-OWCP is required for the provider to bill for this code. The physician must document in the patient's file that he or she spent an additional 30-74 minutes face-to-face with the patient beyond the usual time spent during an office visit. Heidarpour billed this code for extended office visits, knowing that the physicians had not spent or documented additional face-to-face time with the patient.

During the medical review, Ms. Cliett found no documentation in the Advanced patient

files that the doctor had spent the additional face-to-face time to support the billing of a prolonged evaluation.

### 6.    Therapeutic Exercises and Activities

CPT code 97110 is for therapeutic "exercises" provided by a physician or therapist through direct one-on-one patient contact and it is billed in 15-minute increments. CPT code 97530 is for therapeutic "activities" by a physician or therapist through direct one-on-one patient contact and it is also billed in 15-minute increments. Pre-authorization from OWCP is required for the provider to bill for both of these codes after the initial 120-day period of treatment. During the medical review, Ms. Cliett found, for patients with multiple claim files, that Heidarpour billed multiple claim numbers for therapy on the same dates of service, without prorating the charges between the multiple claims files. For example, patient T.C. was at the clinic for one hour on April 20, 2007 for a therapy session. However, Exhibits 701.7 through 701.12 are therapy progress notes for three separate sets of injuries (i.e., three claim files) for that same date of service, each indicating that she did 3 "units" of "exercise" and "activities," as well as many other modalities and treatments, for each of her injuries. Ms. Cliett found that Heidarpour submitted claims to DOL-OWCP on all three claim files for that same date of service for 3 "units" of each of these CPT codes. In other words, patient T.C. would have spent 4 hours and 26 minutes performing the amount of therapy billed for April 20, 2007. Ms. Cliett's medical review produced other such examples of duplicate billing for therapeutic exercises and activities.

### E.    HEIDARPOUR'S DEPOSITION

On February 1, 2013, Heidarpour gave a deposition in case number CV-08-3411 WHA, which is a civil qui tam action pending in the Northern District of California.  In that deposition, Heidarpour was asked about her role as owner and biller for the Advanced clinics, and specifically about her involvement with billing FCEs and the other codes charged in the indictment.

Heidarpour stated under oath that she did not decide what CPT codes to bill but was instead given the CPT codes to bill by the physician and therapists.  (Tr. at 68, 71, 94, 118.)  She also testified she did not run the various Advanced clinics.  (Tr. at 45, 48, 55.)  This is in direct conflict with the testimony of Advanced employees and the evidence collected during the investigation.

With regard to the billing of multiple FCEs when only one FCE was performed, Heidarpour said that she became aware that she had executed a scheme to defraud DOL-OWCP when she received the criminal discovery.  (Tr. at 105-107, 159.)  She claims it was only from criminal discovery that she learned that DOL-OWCP was billed for multiple FCEs that recorded the same starting and ending heart rate, blood pressure, and same grip strength for the same patient, and that it was the physical therapists who were copying the reports, and changing the date of service and injury.  (Tr.159-160.)

> Q:  "And that's how you learned that the physical therapists were copying    the FCE"
> R:  " Yes, ma'am."
> Q:  "– reports and changing the date and injury?"
> R:  " Yes, ma'am."
> Q:  " And you learned that only after discovery in your criminal case?"

R:   " Yes, ma'am."
(Tr. at 160.)

Heidarpour stated that at the time she submitted claims to DOL-OWCP for multiple FCEs for multiple patients with multiple injuries, she did not know that she was billing too many FCEs. (Tr. at 107.)  "I was just billing FCEs."  (Tr. 106.)  "I didn't know I was billing too many."  (Tr. at 108.)  "Through discovery, I found out that sometimes - - not all the times, but sometimes our physical therapists are giving me the same report with different date of service for the same patient."  (Tr. at 142-143.)

When asked specifically about her understanding of what she did wrong as it relates to her billing of multiple FCEs, she said, "I was the owner, part owner of the practices."  (Tr. at 143.)  She denied any other responsibility, even as it relates to the fraudulent billing of other CPT codes to DOL-OWCP identified as relevant conduct in the loss calculations for sentencing. (Tr. at 111, 143.)  Again, these statements are in direct conflict with the testimony of Advanced employees and the evidence.

## **ARGUMENT AND AUTHORITIES**

The factors for the Court to consider in imposing a sentence are outlined at 18 U.S.C. § 3553.  That statute directs that the "nature and circumstances of the offense and the history and characteristics of the defendant" be considered, as well as the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

. ."  The government is concerned that this defendant has not only caused economic harm as a result of her charged fraudulent conduct, but has continued her conduct beyond indictment and beyond her plea of guilt through other medical practices targeting other government victims. In fact, the defendant has denied involvement in relevant conduct, blamed the government for singling her out for prosecution, and has fully failed to accept responsibility for any of her charged conduct, including the count of conviction.

### A.    ENTRAPMENT BY ESTOPPEL

Defendant's primary argument for failing to accept responsibility for her criminal conduct is that, in essence, "the government made me do it."  She cloaks this theory under the legal veil of "entrapment by estoppel."  The crux of her contention is that DOL-OWCP paid most of the fraudulent claims she submitted, never told her she was doing anything wrong, and that this constituted "positive feedback" from which she was led to believe they were acceptable.  She objected to the statement in paragraph 26 of the PSR that "DOL-OWCP relied on the accuracy of the HCFA 1500 claims for payment," even though the HCFA 1500 states:  "NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

Heidarpour asserts that claims made to DOL-OWCP are "subject to stringent review and oversight," which "negates the assertion in paragraph 26" of the PSR stated above.  As with all government health benefit programs, the criminal submission of false and fraudulent claims is handled through a "pay and chase" process, where claims are paid until an investigation reveals

criminal conduct and intent.

Pre-authorization of services by DOL-OWCP does not permit the submission of false and fraudulent claims for those services. And contrary to defendant's position, DOL-OWCP did not require providers to attach medical records to HCFA 1500s. Rather, Section 10.801 of Title 20, CFR, governing claims to DOL-OWCP, states that all charges on a HCFA 1500 "shall be supported by medical evidence" -- not attached to the claim form. Providers are expected to maintain detailed medical records for workers' compensation patients showing the treatment provided, which may be requested from time to time.

Heidarpour contends that because she attached some records to her HCFA 1500s, the DOL-OWCP claims examiners or ACS representatives were required to review those claims and all documentation before approving the claim for payment. This is simply not the case, as proven by the fact that DOL-OWCP does <u>not</u> require submission of medical documentation. The government relies, and must rely, on the truthfulness of claims submitted by medical providers, until such time as evidence may surface to the contrary.

Further, there is no evidence offered by the defendant that the medical records she attached to claims were not the duplicated, altered or fraudulent documents that the government found in its medical review during this investigation. Certainly, defendant's attached documentation did not represent records found to be missing completely from the Advanced patient files.

Heidarpour and employees at her direction contacted ACS numerous times daily throughout the period of the charged schemes to attempt to gain approval of otherwise rejected

or duplicate claims. Heidarpour now asserts that during those calls, she received advice and direction from ACS and DOL-OWCP claims examiners on how to submit claims that the government later found to be fraudulent. However, any conversations she had with ACS or DOL-OWCP about billing issues took place <u>after</u> the submission of a claim -- not before. Although Heidarpour attempted to support this contention in her civil deposition by referring to "call reference numbers" (all of which are documented in writing and provided by the government in discovery) relating to these alleged conversations with ACS and DOL-OWCP, she did not identify a single phone call or documented "call reference number" where she was given instructions by anyone at ACS or DOL-OWCP on how to bill falsely or fraudulently.

The defense theory of "entrapment by estoppel" against the government "works only when 'the government affirmatively misleads a party as to the state of the law and that party proceeds to act on the misrepresentation so that criminal prosecution of the actor implicates due process concerns.'" *United States v. Lovern,* 590 F.3d 1095, 1104 (10th Cir. 2009), citing *United States v. Apperson,* 441 F.3d 1162, 1204 (10th Cir. 2006). In *Lovern,* the defendant owner of a pharmacy claimed that by allowing his pharmacy to keep its DEA license during an investigation concerning the illegal dispensing of prescription drugs, the government affirmatively misled him as to the state of the law. He further argued that the DEA investigative agents had an obligation to warn him that he was running afoul of the law. In rejecting defendant's theory, the Court found that a license may allow the pharmacy to conduct business, "but it does not absolve a pharmacist from his responsibility to avoid knowingly filing unlawful prescriptions." *Lovern,* 590 F.3d at 1104. The Court continued: "[G]overnment agents are

allowed to investigate potential crimes without bearing an affirmative obligation to sit down and advise their targets about the lawfulness or unlawfulness of their activities," . . . and "[s]ilence, of course, does not rise . . . to the level of 'affirmative misconduct' required to warrant estoppel against the government." *Id.,* citing *Wade Pediatrics v. Dept. of Health & Human Services,* 567 F.3d 1202, 1207 (10th Cir. 2009). *See also United States v. Westover,* 107 Fed.Appx. 840, 844, 2004 WL 1790016 (C.A. 10 (Kan.)), citing *United States v. Nichols,* 21 F.3d 1016, 1018 (10th Cir. 1994) ("active misleading" required by the government agent and actual reliance by the defendant to implicate defense of entrapment by estoppel). In *United States v. Isley,* 369 Fed.Appx. 80, 2010 WL 801736 (C.A. 11 (Ga.)), the defendant, a biller for a DME company who was charged with Medicare fraud, claimed an entrapment-by-estoppel defense based on her reliance on "medical necessity approvals" from the Medicare billing intermediary to show that the CPT codes she billed were reasonable and expressly sanctioned, and therefore she lacked the requisite intent to commit fraud. The defendant further suggested that approvals of her prior claims "equated to affirmative statements upon which she could rely in coding the . . . claims of the indictment." *Id.* at 89. However, the Court held that "[t]o the extent that there were misstatements through the MNAs about which product codes were acceptable, unless these statements were made directly to [defendant], her reliance upon them is misplaced." *Id.*

Defendant Heidarpour has pled guilty to a scheme to defraud DOL-OWCP as to the fraudulent billing of FCEs. She has no foundation for claiming a defense theory of entrapment by estoppel for that count, or for any relevant conduct associated with her count of conviction. She has offered no evidence that she relied on affirmative statements made to her personally by

the government that were actively misleading as to the state of the law with regard to any charges in the indictment.

## B.    RELEVANT CONDUCT

A significant factor in determining a defendant's guideline range is the application of relevant conduct under U.S.S.G. § 1B1.3.  As Application Note 1 states, ". . . the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator."  In this case, defendant Heidarpour pled guilty to Count 4 of the indictment, charging a scheme to defraud involving her fraudulent billing of CPT code 97750 to DOL-OWCP for FCEs that were never performed.  In the vast majority of claims submitted by the defendant on behalf of the Advanced clinics during the time frame of the indictment, multiple CPT codes were billed on each claim form under a patient's DOL-OWCP claim number.  For instance, CPT 97750 (FCE) would be billed along with CPT 99080 (special reports), the latter representing CPT codes charged in other counts of the indictment.  While the defendant has conducted a lengthy and intricate campaign since the date of her plea to challenge the government's loss calculations attributed to relevant conduct, she cannot prevail in her contention that the additional schemes charged in the indictment are not appropriately applied as relevant conduct.

Under Application Note 9(A) to § 1B1.3, a "common scheme or plan" contemplates two or more offenses substantially connected by at least one common factor, "such as common victims, common accomplices, common purpose, or similar modus operandi."  In *United States*

*v. Valladares,* 544 F.3d 1257 (11th Cir. 2008), the Court applied this Note in a case involving conspiracy to commit health care fraud, finding that evidence of defendant's submission of Medicare claims was relevant conduct "as part of a common plan or scheme because (1) the victim and purpose (i.e., to defraud Medicare) of the pharmacy and equipment schemes were the same; (2) the two schemes involved the same *modus operandi* of submitting fraudulent Medicare claims; [and] (3) both schemes used many of the same patients to bill Medicare. . ." *Id.* at 1268.

Application Note 9(B) describes offenses that do not fall under 9(A) but "nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses," including "degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." In *United States v. Hamilton,* 587 F.3d 1199, 1221(10th Cir. 2009), the Court clarified that "'same course of conduct'. . . looks to whether the defendant repeats the same type of criminal activity over time. . . . It does not require that acts be connected together by common participants or by an overall scheme. . . .It focuses instead on whether defendant has engaged in an identifiable behavior pattern of specified criminal activity." Regardless of which category this Court chooses, it is clear that the remaining charged schemes in the indictment concerning defendant's fraudulent billing of seven other CPT codes to the same government health care benefit program during the same time frame, often in conjunction with CPT code 97750 in the count of conviction, constitute relevant conduct according to Application Note 9.

The Tenth Circuit has held that, to establish relevant conduct, "the Government must prove by a preponderance of the evidence that the defendant (1) engaged in conduct (2) related to the offense of conviction pursuant to U.S.S.G. § 1B1.3 and (3) constituting a criminal offense under either a federal or a state statute." *United States v. Griffith,* 584 F.3d 1004, 1013 (10th Cir. 2009). Relevant conduct "may include uncharged and even acquitted conduct." *Griffith*, 584 F.3d at 1012; *see also United States v. Watts,* 519 U.S. 148, 154 (1997). The loss calculations in this case for offenses other than the count of conviction represent charged conduct against this defendant under the same statute as the count of conviction (18 U.S.C. § 1347, health care fraud).

Defendant contends that she is not responsible for and has never admitted to any of the charged conduct but that of Count 4 regarding the billing of FCEs. In fact, she has gone to great lengths, particularly in her civil deposition, to profess her innocence of not only the relevant conduct, but also the count of conviction. But that does not affect the scope of the relevant conduct in this case. In *United States v. Watts,* 519 U.S. 148, 154 (1997), the Supreme Court noted that "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction," citing *Witte v. United States,* 515 U.S. 389, 402-403. The government has described herein, and will present convincing evidence at sentencing, that defendant engaged in an extensive scheme to maximize her personal benefit through her control of patient treatment at the Advanced clinics, the opening of multiple patient claim files, and her preparation and submission of fraudulent claims to DOL-OWCP over a period of at least 4

years.  The other charged counts represent part of that overall scheme, and are, by all measures, "relevant conduct" in this case.

The government's proposed loss calculations from defendant's billing of the CPT codes described in the additional schemes charged in the indictment are derived from the <u>actual</u> loss of claims paid by DOL-OWCP based on a medical review conducted by the government's expert witness of a limited sample of Advanced patient medical files obtained through search warrants and administrative subpoenas to all of the Advanced clinics in October 2008.  The expert witness reviewed each paid claim against the medical documentation in the patient's file to determine whether a claim was fraudulent.  No extrapolations or presumptions were made to increase the loss by applying percentages of fraud to the universe of paid claims for those CPT codes over the four-year period of the scheme.  Defendant's challenge to loss based on relevant conduct is without merit.

### C.     <u>ACCEPTANCE OF RESPONSIBILITY</u>

The government agreed in defendant's plea agreement to a 2-level adjustment for acceptance of responsibility if Ms. Heidarpour did not commit any further crimes <u>and</u> did not falsely deny or frivolously contest relevant conduct.  It was also agreed that the government would move for the additional 1-level adjustment for acceptance if the Court found defendant qualified for the 2-level adjustment.  The government is concerned that the defendant, in her strenuous objections to the PSR and inability to accept responsibility in her deposition for fraudulently billing FCEs and other CPT codes, has fully failed to accept responsibility for her criminal conduct.  U.S.S.G. § 3E1.1.  To qualify under this guideline, the Court must consider

whether the defendant has demonstrated acceptance in one or more of the ways outlined in

Application Note 1 to § 3E1.1, including:

> "(A)   truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3. . .*[A] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility* (emphasis supplied)*;*
> (B)   voluntary termination or withdrawal from criminal conduct or associations; [and] . . .
> (H)   the timeliness of the defendant's conduct in manifesting the acceptance of responsibility."

As to paragraph (A), in both her civil deposition of February 1, 2013 (given nearly six

months <u>after</u> entering her plea of guilt) and her objections to the initial PSR, defendant has

demonstrated not only a refusal to accept responsibility for her criminal conduct, but has falsely

denied and frivolously contested all relevant conduct.  *See United States v. Quarrell,* 310 F.3d

664, 682 (10th Cir. 2002) (consideration of acceptance of responsibility adjustment includes

whether defendant admitted to, or at least did not falsely deny, any other relevant conduct);

*United States v. Contreras,* 59 F.3d 1038, 1040-41 (10th Cir. 1995) (court denied acceptance as

defendant significantly understated his culpable conduct and thus falsely denied his involvement

in relevant conduct).

A defendant who enters a guilty plea is not entitled as a matter of right to an adjustment

under § 3E1.1.  (Application Note 3).  It has long been the position of the Tenth Circuit that "the

defendant must show 'recognition and affirmative acceptance of personal responsibility for his

criminal conduct . . . [and] [t]he defendant bears the burden of proving acceptance of

responsibility by a preponderance of the evidence." *United States v. Mitchell,* 113 F.3d 1528,

1534 (10th Cir. 1997), citing *United States v. McAlpine,* 32 F.3d 484, 489 (10th Cir. 1994) and

*United States v. Wach,* 907 F.2d 1038, 1040 (10th Cir. 1990). "[T]he sentencing judge is in a

unique position to evaluate a defendant's acceptance of responsibility." *McAlpine,* 32 F.3d at

489. A court may resolve reasonable disputes over sentencing factors by considering "relevant

information without regard to its admissibility under the rules of evidence . . . provided that the

information has sufficient indicia of reliability." U.S.S.G. § 6A1.3(a).

When a defendant does not truthfully admit involvement in the charged crimes, he or she

is not entitled to an adjustment for acceptance of responsibility. *United States v. Bindley,* 157

F.3d 1235, 1241 (10th Cir. 1998). In *McAlpine,* the court denied acceptance of responsibility

based on an unsworn statement made by defendant to his probation officer. In that statement,

rather than admitting guilt to the charges to which he pled guilty, defendant (as here) attempted

to shift blame to others and away from himself for that conduct. In addition to that statement,

the court cited "the overall tenor of his objections to the presentence report" in supporting its

conclusion that defendant had failed to accept responsibility. *Id.* at 490. *See also United States*

*v. Topete-Plascencia,* 351 F.3d 454, 461 (10th Cir. 2003). In *Topete-Plascencia,* the court found

no evidence in the record other than defendant's guilty plea "demonstrating that he affirmatively

accepted personal responsibility for his criminal conduct. . . [Defendant] gave a vague and

incomplete factual basis for his plea, falsely denied relevant conduct, and lied to Probation."

*Id.* at 461. Further, "[u]nder the Guidelines, an acceptance of responsibility adjustment cannot

be used as a departure mechanism based solely on a court's leniency." *Id.* The Tenth Circuit

affirmed this Court's denial of a 3-level acceptance of responsibility adjustment based on defendant's lies concerning relevant conduct. *United States v. Patron-Montano,* 223 F.3d 1184, 1191 (10th Cir. 2000).

As to Paragraph (B) of Application Note 3, defendant testified in her civil deposition in February 2013 that she was still working as a "consultant" for Kim Ryan, owner of the former Advanced clinics. However, the government obtained evidence thereafter from current and former employees that the defendant was still in control of the former Advanced clinics in Oklahoma, scheduling patients for appointments, directing patient treatment, and handling payroll. The government's investigation also revealed that she had purchased a clinic in Avondale, Arizona in November 2011. After her guilty plea, Heidarpour told employees she was selling the Avondale clinic to Kim Ryan. Defendant's attorneys informed the government just prior to the revocation hearing on April 10, 2013, that the sale was never completed. Beyond indictment and her guilty plea, this defendant made no attempt to terminate her association with the very clinics in which she perpetrated her crimes, and in fact, purchased another clinic.

As to Paragraph (H) of Application Note 3 relating to the "timeliness" of a defendant's acceptance of responsibility, the Tenth Circuit has found that conduct by a defendant that is relevant to the acceptance adjustment may occur and be considered by the court through the date of sentencing. See *United States v. Suitor,* 253 F.3d 1206, 1211 (10th Cir.2001) (court denied acceptance based on defendant's untruthful testimony at sentencing hearing). Since her guilty plea in August 2012, this defendant has exhibited no conduct that qualifies for consideration

under § 3E1.1 as evidence of acceptance. The government anticipates, in light of defendant's burden to prove acceptance of responsibility, that she will rely in part upon "voluntary payment of restitution prior to adjudication of guilt" in Application Note 1(C) to support her argument in favor of the adjustment. However, the money available for restitution in the court fund resulted from the issuance of a temporary restraining order by this Court on the government's motion to secure funds defendant was receiving from the sale of the Advanced clinics in Oklahoma and Virginia. These funds did not result from a voluntary contribution by the defendant.

Based on defendant's conduct since entering her plea of guilty in denying and frivolously contesting relevant conduct and outright denial about her role in her count of conviction under oath, this Court should deny this adjustment.

### D.    <u>ABUSE OF POSITION OF TRUST</u>

The government supports the 2-level increase to defendant's sentence based on her abuse of a position of trust. Defendant previously argued against the enhancement in her objections to the PSR on the grounds that she did not occupy a position of trust with DOL-OWCP because "her actions were subject to stringent review and oversight by both DOL-OWCP and ACS." (Doc. 163 at 53.) This argument is without merit. As previously discussed, the government would direct the Court to the fact that it was defendant's responsibility as a medical biller for the Advanced clinics to submit accurate and truthful claims to DOL-OWCP, and not the responsibility of DOL-OWCP or ACS to conduct a "stringent review" of each claim submitted by a provider.

In an attempt to fit within the specific factual scenario of *United States v. Garrison,* 133 F.3d 831, 833-34 (11th Cir. 1998), an outlier case cited in support of her objection to this enhancement, Heidarpour stated that she "did not report directly to the DOL-OWCP . . . but rather to ACS, which was charged with the responsibility of reviewing and either approving or denying the claims." (Doc. 163 at 54). She claims this "removed relationship" is evidence that she did not occupy a position of trust with DOL-OWCP, the victim in this case. However, throughout her objections to the PSR, as well as in her civil deposition testimony, she insists that DOL-OWCP, unlike Medicare, "employs claims examiners and nurses that are assigned to every file. . . [who] are required to exercise 'keen judgment' to review and adjudicate claims and requests for payment." (Doc. 163 at 27.) Although the HCFA 1500 claim forms are submitted to ACS, defendant notes that ACS "determines whether it can automatically approve the claim, whether the claim requires the approval of a DOL-OWCP claims examiner, or whether the claim should be rejected." (Doc. 163 at 27). She also states that "OWCP's own Claims Manual requires OWCP to deny a bill (and refuse to pay it) if a code is not used correctly." (Doc. 163 at 48). She even blamed DOL-OWCP for "giving the Advanced clinics 'positive feedback. . .' for 'never once'" denying a billing of code 99090, and apparently expected OWCP to inform her when she was improperly billing certain CPT codes." (Doc. 163 at 49). It is inconsistent for the defendant to contend that she did not occupy a position of trust directly with DOL-OWCP when she attributes so much direct involvement to them in the claims process.

Heidarpour admitted in her deposition testimony that the clause in her medical billing contract between A.B.C. Billing and the Advanced clinic in Dallas stating that she "has

specialized knowledge with respect to certain medical administrative services, including but not limited to office management, billing, general regulatory reporting, . . . and general medical billing consultation" was truthful and that she was the only person at A.B.C. Billing with that knowledge.  (Depo. Tr. at pp. 85-86).  During the schemes charged in the indictment, Heidarpour exercised significant control over the operation of the Advanced clinics and the billing of medical services to DOL-OWCP.  She worked primarily from her home in Edmond, and at different times, hired and trained a couple of inexperienced employees to help her with billing.  As noted in the PSR, "the defendant, in every practical manner, operated as the manager of the business and held the highest position of trust and confidence in that business."  (Doc. 163 at 54).  The government will offer evidence at the sentencing hearing that the defendant directed patient treatment, created pre-circled authorization and treatment forms for use in the clinics, directed employees by phone each day on what services to provide, directed employees to alter treatment forms to maximize billing opportunities, and that all medical records and sign-in sheets were faxed to the defendant at the end of each work day for her to do the billing. Further, as discussed in detail above, defendant knew her obligations and responsibilities to be truthful in the submission of claims to DOL-OWCP, and that DOL-OWCP relied upon all providers to submit truthful claims in accordance with the requirements of FECA regulations.

The defendant's exercise of autonomy and concealment from others of her fraudulent billing practices to DOL-OWCP over the course of many years puts her squarely in a position of trust under § 3B1.3, which describes "public or private trust" as one "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily

given considerable deference)." These are persons "subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.* The Court must consider two elements to find application of this enhancement: "(1) whether the person occupies a position of trust, and (2) whether the position of trust was used to facilitate significantly the commission or concealment of the crime." *United States v. Spear,* 491 F.3d 1150, 1153 (10th Cir. 2007). The Tenth Circuit clarified that "'[p]osition of trust' . . . actually has little to do with *trustworthiness* and everything to do with *authority* and *discretion* . . .[and] is concerned with persons in positions of authority abusing their lack of supervision to commit or conceal wrongdoing." *Id.* at 1154. "The discretion necessary to qualify for the enhancement exists where the person charged had the authority to make broad case-by-case decisions for the organization." *Id.* at 1155. *See also United States v. Hodge,* 259 F.3d 549 (6th Cir. 2001) (touchstone for finding that health care providers occupy a position of trust with insurance companies is amount of discretion the person has in his or her position of employment). "The enhancement requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required." *United States v. Brunson,* 54 F.3d 673, 677 (10th Cir. 1995). Although Heidarpour was admittedly an owner of the Advanced clinics in Oklahoma, she was an employee of the Advanced clinics in Texas and California for purposes of the charges in the indictment. "Typically, the question of whether an employee occupied a position of trust within the meaning of § 3B1.3 is a heavily fact-specific determination to be made by the district court using the guideline and other factors which we have recognized." *United States v. Edwards,* 325 F.3d 1184, 1187 (10th Cir. 2003).

In *United States v. Miller,* 607 F.3d 144 (5th Cir. 2010), defendant, the owner of a medical supply business, was found to have occupied a position of trust with Medicare and Medicaid because she "effectively exercised the discretion that [those] programs entrust to physicians by knowingly completing CMNs for patients who had no need for the equipment provided."  The court continued:

> There was evidence that [defendant] obtained a set of pre-authorized, blank CMNs from Dr. Long and simply filled in patient names as they became known to her.  Under the scheme she devised, Miller assumed the position of the certifying physician, and, . . . she made the key decision whether a particular patient had a medical need for a wheelchair or scooter." *Id.* at149.

Other similarities between Miller and Heidarpour are apparent.  Miller "directed and oversaw the business operations at both her company and a related company [and] [s]he specifically instructed an employee to complete pre-authorized CMNs with patient information." *Id.*  And as with DOL-OWCP, the court reasoned that "here, the established protocol of the government insurance programs depended upon the honesty and forthrightness of the DME provider in its claim submissions . . . and the government entrusted [defendant] to provide good faith, accurate information in seeking reimbursement from Medicare and Medicaid." *Id.* at 150.  The court concluded that the defendant's "success in exploiting the lack of government monitoring vividly demonstrates that her position 'provide[d] the freedom to commit a difficult-to-detect wrong,' which is the 'primary trait' of one who holds a position of trust." *Id.*, citing *United States v. Brown,* 7 F.3d 1155, 1161 (5th Cir. 1993) (quoting *United States v. Hill,* 915 F.2d 502, 506 (9th Cir. 1990)).

The defendant in *United States v. Conner,* 262 Fed.Appx. 515, 2008 WL 215399 (C.A.

4 (N.C.)), appealed the abuse of trust enhancement, contending that the relationship between his medical transportation service and the victims of the offense, i.e., federal health care programs, "was contractual and not fiduciary, and because he held no other position of trust, such as a physician or other professional person . . ." *Id.* at 2.  In affirming the enhancement, the court stated:

> Because of the nature of these vast government programs, it is essential to their functioning that trust be imposed on the service provider to capably and honestly determine in the first instance which patient transactions are entitled to reimbursement.  Otherwise, the added delay and expense might jeopardize the very existence of the programs.  *Id.* at 3.

In a case factually similar to *Conner,* the Fifth Circuit stated "[w]e have consistently affirmed the position of trust enhancement's application to Medicare and Medicaid providers when sufficient evidence supported a finding that they had substantial discretion to submit claims they knew would likely not be scrutinized."  *United States v. Read,* 2012 WL 5377737 (C.A. 5 (Tex.)), at 12.  The Fifth Circuit specifically affirmed the abuse of trust enhancement to a fraud sentence "where the defendant employed discretionary authority given by her position in manner that facilitated or concealed the fraud.":  "[A] court must determine the extent to which the defendant's position provides the freedom to commit a difficult-to-detect wrong. . . In other words . . . the defendant's position must involve discretionary authority."  *United States v. Buck,* 324 F.3d 786, 793 (5th Cir. 2003), citing *United States v. Hirsch,* 239 F.3d 221, 227 (2d Cir. 2001).

It is clear from the evidence that under any set of elements or authorities, Heidarpour occupied a position of trust with the victim in this case, DOL-OWCP.  She was an owner of

both Oklahoma Advanced clinics, and in control of the others. She was the sole biller for the Advanced clinics throughout the period of the indictment. And she exercised complete discretionary authority in perpetrating her health care fraud schemes. The government urges this Court that the 2-level enhancement for abuse of position of trust must stand.

## E. <u>FINE</u>

Imposition of a fine is appropriate where the Court determines that a fine will not impair the defendant's ability to make restitution. 18 U.S.C. § 3572(b). The defendant has agreed to make restitution to the government in the amount of $120,689.84 for the count of conviction, and to refund an additional $1,000,000 to the government for services paid by DOL-OWCP. The parties agreed that the $1,000,000 will be applied toward any civil recovery in case No. CV-08-3411-WHA which is pending in the Northern District of California. The amount attributed to restitution for the count of conviction has been paid into the court fund as a result of a temporary restraining order issued by this Court on the government's motion to secure funds defendant was receiving from the sale of the Advanced clinics in Oklahoma and Virginia. Therefore, there is absolutely no impairment of the defendant's ability to make restitution to DOL-OWCP such that this Court should decline the invitation to impose a fine.

Title 18, United States Code, Section 3572(a) sets forth the factors a Court is to consider in deciding whether to impose a fine. They include "defendant's income, earning capacity, and financial resources," and whether the imposition of a fine will impose a financial burden "upon the defendant" or any "person who is financially dependent on the defendant . . ." The Court should consider "any pecuniary loss inflicted upon others as a result of the offense;" "whether

restitution is ordered or made and the amount . . . ;" "the need to deprive the defendant of illegally obtained gains from the offense;" and "the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence."

Based upon these factors, the government believes that the imposition of a substantial fine is appropriate. The defendant clearly has the financial resources to pay a fine and the imposition of such would not impose a financial burden upon the defendant or her husband. The defendant's two children are adults and not living at home. Additionally, the loss amounts identified in the PSR are actual loss amounts and do not reflect the full pecuniary loss to DOL-OWCP. Actual loss figures were used in this case because without a complete medical review of each and every medical file, the government does not have the ability to determine how many times the seven CPT codes were billed incorrectly. The government does know that from January 2005 through July 2009, the Advanced clinics were paid $9,955,783.18 by DOL-OWCP for the seven CPT codes identified in the indictment. From those receipts the defendant received an ownership draw as well as an additional 10% cut of the billing receipts as compensation for doing the medical billing for the clinics. The imposition of a fine will deprive the defendant of illegally obtained gains from the offense.

Pursuant to Title 18, United States Code, Section 3571(b)(3), the statutory maximum fine the Court could impose is $250,000. However Section 3571(d) provides:

> If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process.

Using the actual loss figures already provided to the defendant the government requests that this Court impose a fine in the amount of $2,000,000 at sentencing.

## **CONCLUSION**

The government respectfully requests that the Court accept the PSR as written, and review with concern whether the defendant has accepted responsibility for her actions.

Respectfully submitted,

SANFORD C. COATS
United States Attorney

***s/ Vicki Zemp Behenna***
Assistant U.S. Attorney
Okla. Bar Number 10734
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8700 (office)
(405) 553-5555 (fax)
vicki.behenna@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2013, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants: Drew Neville, Kevin Krahl, and John Gile.

***s/Vicki Zemp Behenna***
Assistant U.S. Attorney
